METRO TAXICABS, INC., Plaintiff and Appellee, v. TREASURER OF PUERTO RICO, Defendant and Appellant.

No. 10295.   Argued March 1, 1951.—Decided February 26, 1952.

*Víctor Gutiérrez Franqui, Attorney General,* (*Vicente Géigel Polanco, Former Attorney General,* on the brief), and *Manuel J. Medina Aymat, Assistant Attorney General,* for appellant. *F. Fernández Cuyar* and *Luis Tirado Géigel* for appellee.

MR. JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of the Court.

On March 13, 1949, internal revenue officers captured the motor vehicle P–24141, Pontiac, owned by Metro Taxicabs, Inc., while engaged in the transportation of intoxicating beverages on which the internal revenue tax had not been paid. The Treasurer of Puerto Rico proceeded to confiscate said motor vehicle, pursuant to the provisions of § 62 of Act No. 6 of June 30, 1936, (Spec. Sess. Laws, p. 44) known as the "Spirits and Alcoholic Beverages Act," as amended by Act No. 244 of May 12, 1945 (Sess. Laws, p. 816).[1]

---

[1] Said Section provides:

"The Treasurer is hereby authorized to confiscate any vehicle, boat, motor launch, horse, beast, or any water or air craft which is apprehended loaded or while loading, unloading, transporting, carrying or transferring any distilled spirits or alcoholic beverages illegally manufactured, imported, distilled or rectified and on which the taxes prescribed by this Act have not been paid; and the same shall be sold at public auction for the benefit of the People of Puerto Rico; *Provided,* That the Treasurer in his discretion may, if the public service so requires, designate such vehicles, boats, motor launches, or horses as he may deem necessary for the official use of the officers or employees duly authorized by the Department of Finance."

166

The plaintiff-appellee, within the term and in the manner provided in § 97 of the Act, appealed to the District Court of San Juan praying for the return and delivery of the motor vehicle which had been confiscated. After a hearing was held on April 28, 1949 and the case was submitted, it was later reopened on November 9 to receive additional evidence presented by plaintiff. The lower court reversed the decision of the Treasurer and ordered the return and delivery of the motor vehicle to the Metro Taxicabs, Inc. The Treasurer appealed to this Court and alleges in his brief that the lower court erred (1) in holding that what practically happened in the instant case was the theft of the use of the vehicle, since the person in charge thereof at the moment of the confiscation came into its possession by means of deceit and trickery, without the knowledge or permission of plaintiff-appellee; (2) in implicitly holding that plaintiff-appellee constitutes an innocent third party in favor of which, it could exercise its discretion, ordering the devolution of the vehicle, and (3) in reversing the decision of the Treasurer of Puerto Rico decreeing the confiscation of the vehicle.

■ The findings of fact of the lower court were as follows:

"The Metro Taxicabs, Inc., is a domestic corporation, owner and operator of a taxicab enterprise engaged in the transportation of passengers for pay. Said corporation is owner of the vehicle confiscated herein, which on March 13, 1949 formed part of its taxicab fleet. The night prior to that date, plaintiff assigned said vehicle to Andrés Alicea Crespo to work on a shift which would end at six o'clock in the morning of March 13. Alicea worked his shift and at five o'clock returned to plaintiff's central station to give account for his work and deliver the taxicab. Upon meeting his friend Ángel Gómez Gutiérrez, near the central station, Alicea once again took the taxicab in order to take Gómez to his home at La Perla, San Juan. Instead of taking Gómez to La Perla, when they were passing by the Yacht Club, Alicea, at Gómez's suggestion, drove towards a ward in Bayamón to take up a "fare" which Gómez told him he had in that town. When in Bayamón, Gómez asked Alicea to let him

drive, alleging that he (Gómez) knew the road better. The taxi stopped in front of a bar, Alicea dismounted and went to the bar to drink coffee, and Ángel Gómez Gutiérrez then took the taxi and drove out towards a ward of Bayamón. There he obtained several cans of rum and placed them in the trunk and rear seat of the taxi and returned to Bayamón. He picked Alicea at the bar where the latter had stayed, driving then back to San Juan by way of highway No. 2. When Alicea noticed that Gómez Gutiérrez had introduced rum into the taxi he protested but because of the advanced hours of the night and that Alicea had to return to San Juan where he lived and deliver the taxi to plaintiff, he boarded the car. When the taxicab was passing by the District Hospital of Bayamón, a tire blew out and while it was being repaired they were caught by the Internal Revenue officers who seized the rum and the taxi."

In its Conclusions of Law, after making reference to the applicable law, the lower court stated thus:

"It has been said that a forfeiture proceeding is 'In Rem.' It is directed against the vehicle itself and not against its owners. It is a civil action which by its nature is criminal. In it, the use given to the thing determines the forfeiture without need to examine the degree of innocence or guilt of the owner. The responsibility lies in the possession at the time of the violation, no matter whether the guilty person is using it contrary to the owner's instructions. When the owner puts the vehicle in possession of the violator, he runs the risk that goes along with whatever use to which the one in possession devotes it. And if he violates the provisions of law, forfeiture lies. See *E. J. Fitzwilliam Co.* v. *Commonwealth,* 154 N. E. 570; *Buchholz* v. *Commonwealth,* 102 S. E. 760; *Commonwealth* v. *Certain Motor Vehicle,* 159 N. E. 613, 61 A.L.R. 548; *State* v. *One Studebaker Automobile,* 210 N. W. 194; *Pennington* v. *Commonwealth,* 102 S. E. 758; *Crapp* v. *State,* 98 S. E. 174.

"Such is the prevailing doctrine. But the Law is Justice, and it is Justice what is sought in the Courts; hence, the doctrine is not absolute. The Courts may exercise their discretion in favor of innocent persons without losing sight of the interest or right which the government has over the vehicle. *United States* v. *Ford Coupe,* 17 F. Supp. 331; *C.I.T. Corporation* v. *United States,* 89 F. 2d 977. In those cases where it is shown

to the satisfaction of the judge that the possession of the vehicle was obtained by the violator without the express or implied consent of the owner or of the innocent party, as happens, for example, when the car is 'stolen,' the rights of the owner or of the innocent third party are protected and safeguarded. If the owner or interested third party has not placed, directly or indirectly, the vehicle in possession of the violator, then the rights of the owner or third interested party are not subject to forfeiture. See *General Motors Acceptance* v. *Brañuela*, 61 P.R.R. 701, 704–708 and cases cited therein.

"The evidence in the case at bar, leaves no room for doubt that the violator, Ángel Gómez Gutiérrez, was not placed, directly or indirectly, by plaintiff in possession of the vehicle. Said evidence clearly reveals that Gómez Gutiérrez did not have the consent, express nor implied, of Metro Taxicabs Inc., to drive or use the taxi. On the contrary, the evidence is clear and definite in the sense that plaintiff had strictly forbidden all of its drivers to give a taxi to any other person, not even to the other drivers of the corporation, and it also shows that it was forbidden to drive the taxis out of the Metropolitan Zone without plaintiff's special permission, which permission was not obtained in the instant case. As a matter of fact, therefore, the use or possession of the taxicab by Ángel Gómez was illegal and unauthorized. This case practically deals with theft of the use of the taxi. Gómez took possession of the seized vehicle by means of deceit and trickery without knowledge or authorization of plaintiff and in violation of the rules of said corporation. *United States* v. *One Chevrolet Automobile*, 21 F. 2d 477, aff. *United States* v. *General Motors Acceptance Corporation*, 25 F. 2d 238. *United States* v. *One Reo Speed Wagon*, 5 F. 2d 372, aff. *United States* v. *Almeida*, 9 F. 2d 15.

"It must be borne in mind that this is not a private vehicle, but a taxicab, part of a fleet of vehicles devoted to the public service."

In view of the nature of the errors assigned by appellant, and the state of our case law, we must determine, at the outset, whether the conclusions of the lower court that Gómez "was not placed directly or indirectly by plaintiff in possession of the vehicle," and that "This case practically deals with theft of the use of the taxi," find support in the evi-

dence. On these particulars, Andrés Alicea Crespo, witness for plaintiff—and who was the only proof that the lower court had as to the way in which the taxi passed from Alicea's possession to Gómez's—testified at the hearing on elaboration of evidence on November 9, 1949, that as substituting driver of the Metro Taxicabs, Inc., he worked the shift from six o'clock in the evening of March 12, 1949, to six o'clock in the morning of March 13. About five o'clock in the morning "when I was coming to deliver the taxi, I met Ángel Gómez Gutiérrez, in front of the station of the Corporation" (in 601 Fernández Juncos Ave. in front of the airport entrance), who was waiting for him to drive him home.[2] He did not deliver the taxi, and used it instead to take Gómez to his home at "La Perla," in San Juan. Upon approaching the Yacht Club, Gómez told him to turn towards Ponce de León Ave., "because he had to take up a fare in Bayamón."[3] Alicea continued with Gómez towards Bayamón and "upon reaching the crossing at Bayamón, which continues up to a place called Mimiya," Gómez told him:

---

[2] Witness for appellee, René López de Victoria, telephone operator of the Company—in charge of the night service—testified at the first hearing that Alicea arrived at the office at five o'clock in the morning, picked Gómez and told López that he would take him home and return immediately. When witness left his work at six o'clock in the morning, Alicea had not returned yet.

Witness Blanca Barreras de Tirado, treasurer-manager of the corporation, testified at that same hearing that "when an employee finishes his work at two or three o'clock in the morning, I have expressly authorized the drivers to take the employee gratis to his home."

[3] On direct examination at the hearing of April 28, the manager-treasurer, upon being asked whether the taxis of the Corporation gave service "within and outside the metropolitan area," answered that "They cover all the entire area, the whole island"; that they were authorized to do so. She testified likewise that there was no reason to worry or be alarmed on part of the officers of the Metro Taxicabs, and even of the telephone operators themselves, when a certain period of time elapsed without hearing from a certain chauffeur who was assigned to a vehicle rendering service, and that a chauffeur could take passengers without previous notice to the central station.

"As you don't know these roads which are rather rough give me the car and I can take up the fare." Alicea "did not know what he meant and since he was also a driver [of the Metro Taxicabs, Inc.] he gave him the car and stayed drinking some coffee until he returned." [4] A half hour later Gómez returned bringing "the smuggled rum" in the car. Alicea told him: "What's this you bring here?" Gómez answering: "It's nothing, get in, get in the car. Nothing is going to happen." Alicea got in "because he had to deliver the car." Gómez was driving. Near the District Hospital, a tire blew out. Alicea was getting ready to fix it, while Gómez "was hiding the rum in a sugar cane field." While doing so, the internal revenue agents arrived, taking them by surprise.

When the judge questioned him "Did you object or not?" he answered "Yes."—"Then, why did you remain with him?"

---

[4] On this point, the manager-treasurer testified on cross-examination, at the hearing of April 28, that Alicea upon showing her the card corresponding to the fares he had taken, one or two days after the occurrence, told her that he had "no excuse," that the only thing which could justify him was his weakness.

"Q. What did he tell you of his weakness?

"A. Because he went to take Gómez home, to go to bed, and instead of driving him home, he took him to the house of this people where the cargo, the smuggled goods, was, that he refused, but that the owner of the smuggled rum was there and this was his weakness.

"Q. Then Gómez, the owner of the smuggled goods and he were in the taxi?

"A. Yes, he considers that that was his weakness.

"Q. Did he explain that to you?

"A. Yes, sir.

"Q. At the first opportunity he had to speak to you?

"A. Yes, sir.

"Q. As soon as he came out on bail?

"A. Yes, sir.

Previously she had testified, on direct examination, that Alicea had told her "Doña Blanca, if I have to serve three or five years in prison so that you do not lose the car, say how, and I will do it." "I have no excuse, I understand it, but I am guilty."

A. "Because I was in charge of the car and I had to deliver it."

On the cross-examination: He did not reach the office to settle the taxi account when he picked Gómez to drive him home. He was not going to charge him anything. He did not receive instructions from anybody to drive him home. He did not know if when Gómez told him "Turn to Ponce de León, that I have to take up a fare in Bayamón" he meant a personal trip of Gómez or "a fare or something and we were going to pick it up." He believed it was "some one whom he had to pick somewhere."

When Gómez asked him for the car, he told him "Take it" and he gave it to him. Gómez took it away and he stayed in a bar drinking a "cup" of coffee. When Gómez returned he had the rear of the car "full of rum." The agents surprised them while Gómez was taking out the rum to hide it "in the sugar cane field" [5] and he was with "the jack in his hand" ready to fix the tire.

On redirect examination he testified that Gómez was working as substituting chauffeur in the "Metro," just as he was, but that he was not on duty that night; and that the

---

[5] According to the testimony of Luis López Silva, internal revenue agent, at the hearing of April 28, 17 large cans were seized, each one containing five gallons of "cane rum" clandestinely made; ten inside the car and seven in the cane field. According to this witness—who testified for the appellee—and the other internal revenue officer, José Antonio Rivera, besides Gómez, who was taking the rum out of the automobile, and Alicea, who was with "the jack" in his hand as though fixing the tire, there was a third person in the cane field on the side of the highway "carrying the rum to hide it in the cane field," who, upon seeing the officers started to run across the field. According to Rivera, when the agents arrived, Alicea said: "They have caught me." The criminal action brought against Alicea and Gómez in the Municipal Court of Bayamón was dismissed as to Alicea on motion of the Treasurer's attorney, who was acting as special private district attorney and who stated that he had no evidence against said defendant. Gómez was sentenced after a trial.

"Metro" did not have, as far as he knew, any rule against handing the vehicles to other persons.[6]

Based on these facts, it is easy to note that the conclusion of the lower court, in the sense that "This case practically deals with theft of the use of the taxi"—after stating "As a matter of fact, therefore, the use or possession of the taxicab by Ángel Gómez Gutiérrez was illegal and unauthorized"—is erroneous. The vehicle was in Alicea's possession, plaintiff's employee, and Gómez came into its possession with Alicea's authorization, who gave it to Gómez so that he would go to "take up a fare." Disregarding now the explanation that Alicea gave to the Manager-treasurer as to what happened, see footnote 4, Alicea's own testimony reveals that when Gómez returned with the "smuggled rum" inside the car to the place where the former had stayed drinking coffee while waiting for him, Alicea got into the car "because he had to deliver the car," notwithstanding that he had noticed that the car was "loaded with rum." Although when the trial judge asked him "Did you protest or not?" he answered "Yes," he did not state however, in what consisted his protest nor how he had manifested it. On the contrary, his own testimony reveals his consent—having already knowledge of the existence of the smuggling—in allowing Gómez to continue in possession and control of the vehicle thereafter allowing it to be used in the transportation of clandestine rum.

■ According to Alicea's testimony—on which the trial judge bases all his findings of fact—and without considering other particulars which arise from the rest of plaintiff's evidence, it is obvious that this case deals, at most, with the

---

[6] The President of the Corporation, Luis Tirado Géigel, testified at the hearing of November 9 that the drivers were forbidden to hand over to any other person, including fellow drivers of the corporation the vehicle assigned to them; and that in order to go outside the metropolitan area they had to call the office and ask for permission, which was not done in the instant case.

unauthorized use of a vehicle by the employee to whom it was entrusted, who delivered it to, and consented and allowed another person to use it unlawfully. That circumstance, however, does not protect plaintiff. In such situation the rule set forth in *General Motors Acceptance* v. *Brañuela*, 61 P.R.R. 701, in the sense that "if the owner or the third innocent party directly or indirectly has placed the vehicle in the possession of the violator or of the person under whose orders he acts, the rights of the owner or of the third innocent party, under such circumstance, run the risk that goes along with whatever use to which the one in possession dedicates the vehicle," is clearly in point. That was the holding of this Court in said case construing the scope of § 62 of the Spirits and Alcoholic Beverages Act, *supra:*

"On the other hand, the Supreme Court, interpreting § 3450 of the Revised Statutes of the United States, from which § 62 of the Spirits and Alcoholic Beverages Act has been taken, has decided that the confiscation proceeding is directed against the vehicle itself and not against its owner and that therefore the rights that upon said vehicle could be had by innocent third parties are not protected, *except in those cases in which it is proved that the possession of the vehicle has been obtained by the violator without the express or implied consent of the owner or of third innocent parties, as happens when the vehicle has been* ' *stolen.* In other words, if the owner or the third innocent party directly or indirectly has placed the vehicle in the possession of the violator or of the person under whose orders he acts, the rights of the owner or of the third innocent party, under such circumstance, run the risk that goes along with whatever use to which the one in possession dedicates the vehicle." (Italics ours.)

The preceding doctrine is supported by *Goldsmith Jr.— Grant Co.* v. *United States*, 254 U. S. 505, 65 L. Ed. 376 and *Dobbin's Distillery* v. *United States*, 96 U. S. 395, 24 L. Ed. 637, cited in *Brañuela* case, as to the fact that the rights which innocent third parties may have over the vehicle are not protected by § 3450 of the Revised Statutes of the

United States—§ 62 of ours, *supra.* In the *Brañuela* case, however, the cases in which the vehicle was *stolen* are excepted; also those in which the violator has obtained possession of the vehicle without the express or implied consent of the owner. Precisely, the National Supreme Court referred to those cases in *Goldsmith Jr.—Grant Co.* v. *United States, supra,* withholding its opinion as to whether § 3450 already cited covered "property stolen from the owner, or otherwise taken from him without his privity or consent."

But evidently none of these situations exist in the case at bar. The vehicle herein was not stolen from plaintiff, nor from its employee—Alicea. He delivered it to Gómez —even if by doing so he was violating the rules of the company—and Gómez, with his privity and consent used the vehicle for the transportation of smuggled rum. The facts clearly place the case within the ruling of the *Brañuela* case, having no bearing herein the cases of *United States* v. *One Chevrolet Automobile, supra,* affirmed in *United States* v. *General Motors Acceptance Corporation, supra,* and *United States* v. *One Reo Speed Wagon, supra,* affirmed in *United States* v. *Almeida, supra,* cited by the lower court and the last two also by appellee. Likewise inapplicable are *The Dependent,* 24 F. 2d 538 and *United States* v. *One Ford Coupe Automobile,* 21 F. 2d 639, cited by the appellee [7] in which cases the situation is essentially similar to *Sánchez* v. *Treasurer of Puerto Rico,* 72 P.R.R. 127. The *ratio decidendi* in the latter is to the effect that the confiscation of an automobile does not lie when a passenger who boards the vehicle introduces in the same a package which contains smuggled rum, without the knowledge of the owner and driver.

---

[7] As regards *United States* v. *Two Barrels of Whiskey,* 96 Fed. 479, also cited by appellee, see *United States* v. *One Saxon Automobile,* 257 Fed. 251.

In view of the foregoing, we are forced to conclude that the lower court committed error in reversing the decision of the Treasurer confiscating the vehicle, and ordering its return and delivery to plaintiff. Therefore, the judgment will be reversed and the complaint against the Treasurer is dismissed.